IN THE UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| RANDALLSTOWN AFRICAN INTERNATIONAL MARKET, LLC, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | | Case No.: 1:16-cv-04050-GLR |
| v. | * | |
| UNITED STATES, | * | |
| Defendant. | * | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO BIFURCATE

Plaintiffs Randallstown African International Market LLC ("Randallstown"), Alvan Okoroji, and Elizabeth Isabemoh, by and through undersigned counsel, pursuant to Local Rule 105.1, hereby files and serves this Memorandum in Support of their Motion to Bifurcate and states:

## Introduction and Factual Background

This action is for judicial review of a Final Agency Decision, dated November 15, 2016 ("FAD"), of the U.S. Food and Nutrition Service ("FNS"), permanently disqualifying Randallstown from participation as an authorized retail food store in the Supplemental Nutrition Assistance Program ("SNAP") for trafficking in SNAP benefits. FNS's administrative charges against Randallstown were not triggered by an undercover investigation involving the exchange of cash, drugs or alcohol for SNAP benefits; rather, it was triggered by FNS's Anti-Fraud Locator Using EBT Retailer Transactions ("ALERT") system. FNS's ALERT system is a computerized program that flags "patterns of transactions" that FNS describes in letters charging retailers with trafficking, based on Electronic Benefit Transactions ("EBT") that establish a

"clear and repetitive pattern of unusual, irregular, and inexplicable activity for your type of firm[1]." *See e.g.* A copy of FNS's Charge Letter to Randallstown, dated January 13, 2017, is attached hereto as Exhibit A. Once a SNAP-authorized retailer is flagged by the ALERT system, the transactions are reviewed by FNS officials and staff, along with other information[2] regarding the store that the agency has compiled, in order to determine whether a sufficient number of "unusual, inexplicable, and inexplicable" EBT transactions occurred at an FNS-authorized retail food store to establish a pattern. It is important to note that FNS has not disclosed thresholds that FNS uses to determine whether a pattern of "unusual, irregular, and inexplicable" EBT transactions took place sufficient for the agency to issue a letter to the retailer charging it with trafficking (or other program violations).[3] It is clear that unless the number of allegedly "unusual, irregular, and inexplicable" EBT transactions exceeds its threshold(s), FNS does not believe that those transactions constitute trafficking and are merely expected outlier transactions.

In this case, FNS's identified 908 EBT transactions at Randallstown as patterns of trafficking on four attachments to the Charge Letter. FNS's investigation of Randallstown was

---

[1] No statute and none of FNS's SNAP regulations define "unusual," "irregular," or "inexplicable." FNS also does not appear to have any guidance or other policies or procedures that shed light on what these terms mean or their origin.

[2] FNS frequently relies upon contractors to conduct an inspection of the store and rarely, if ever, contacts the store owner or conducts any field investigation and its anti-trafficking efforts are focused on smaller supermarkets and convenience stores.

[3] FNS has refused to produce information surrounding these thresholds or the establishment thereof, both in the context of its responses to the Plaintiffs' written discovery requests and Plaintiffs' 30(b)(6) deposition notices. While the discoverability of FNS's thresholds will be the subject of forthcoming letter/motion practice, Plaintiffs make reference thereto because discovery related to SNAP beneficiaries whose EBT cards were issued by state agencies other than Maryland DHR will be unnecessary if the sum of those transactions falls below FNS's thresholds. Stated differently, if the total of all non-Maryland transactions are, at most, expected outlier transactions (and therefore not unusual, irregular, or unexpected), there will likely be no need to conduct discovery of those beneficiaries or state agencies.

triggered by ALERT system scans. Based largely upon the ALERT system scans, FNS administratively determined in the FAD that Randallstown engaged in patterns of transactions determined to be trafficking.[4] FNS does not contend that each and every transaction identified in the attachments to the Charge Letter was definitively a transaction in which Randallstown engaged in trafficking. To the contrary, FNS anticipates that some retailer transactions which are closer in time from the same or a different household, for amounts greater than average at similarly sized stores in the state, and which result in the depletion of some or all of a household's EBT balance to occur at virtually every SNAP authorized retailer. While some of these "outlier" transactions are expected by FNS and not believed to be indicative of trafficking, once FNS's undisclosed threshold is exceeded, those transactions are contended by FNS to constitute patterns of transactions at which trafficking in SNAP benefits took place.

The overwhelming majority of SNAP transactions at issue in this case and identified on the attachments to the Charge Letter relate to SNAP redemptions by Maryland residents who used an EBT card issued by the Maryland Department of Human Resources ("DHR") to redeem SNAP benefits at Randallstown. Those transactions and the identification of those beneficiaries who used EBT cards at Randallstown were the subject of a subpoena directed to DHR. This Court, on June 15, 2017, denied DHR's Motion to Quash and ordered the production of the

_____

[4] FNS's Charge Letter referenced four patterns of transactions which were described as "unusual, irregular, and inexplicable." These patterns are described as "too close in time from the same household," "too close in time from different households," "exhaustion of most or all household benefits in too short a period of time," and "unusually large" transactions. The origin of these patterns appears to be an unsolved mystery, including to FNS – the agency that determined Randallstown to have engaged in trafficking based on patterns of transactions flagged by its ALERT system. *See* Transcript of Douglas Wilson, dated October 28, 2016, FNS's 30(b)(6) designee regarding its ALERT system, at 26-29. A copy of the excerpt of the Wilson deposition transcript is attached hereto as Exhibit B.

requested transaction history and personal identifying information for the beneficiaries who used their EBT card to redeem SNAP benefits at Randallstown. *See* Dkt. No. 30.

As noted above, not all of the EBT cards used in the transactions referenced on the attachments to the Charge Letter which served as the basis for the FAD (and this judicial review proceeding), were issued by Maryland DHR. A small number of EBT cards were issued by other state agencies other than Maryland DHR. Specifically, 8 EBT cards issued by Pennsylvania's state SNAP agency were used at Randallstown and identified on the attachments to the Charge Letter. And only a single EBT card issued by each of the SNAP agencies for the District of Columbia, Georgia, Kansas, Kentucky, Michigan, Texas, and Wisconsin was used at Randallstown and identified on the attachments to the Charge Letter.

Plaintiffs respectfully submit that bifurcation of this matter into two phases is reasonable, appropriate, would promote efficiency, and would conserve scarce judicial and litigant resources. Plaintiffs propose bifurcation of this matter into two phases: Phase 1 would involve discovery and motion practice limited to transactions by Maryland residents using an EBT card issued by DHR and Phase 2 would involve discovery and motion practice related to transactions by residents of states other than Maryland using an EBT card issued by other state agencies. In the event that this motion is not granted, the Plaintiffs will need to serve subpoenas on each of these eight (8) state agencies that issued an EBT card to a SNAP beneficiary that redeemed SNAP benefits at Randallstown during the Review Period and referenced on the attachments to the Charge Letter. It is anticipated that most, if not all, of the state agencies served with subpoenas will file motions to quash similar to the one filed by DHR. And assuming that district court judges in those jurisdictions adopt this Court's sound reasoning and deny those motions, the Plaintiffs anticipate needing to depose a substantial number of SNAP beneficiaries in those

jurisdictions. With the exception of those SNAP beneficiaries who reside in southern Pennsylvania, the District of Columbia, and Northern Virginia, counsel will need to travel more than an hour – and in some instances, considerably further – to attend those depositions.

The Plaintiffs further submit that the United States will not sustain prejudice in the event that this matter is bifurcated for discovery and motion practice purposes. If this motion is granted, discovery related to SNAP beneficiaries will be limited to Maryland residents only. The United States will be able to seek summary judgment – if it chooses – assuming that it can prove that a sufficient number of SNAP transactions above FNS's threshold for each allegedly unusual, irregular, and inexplicable pattern exists[5]. The Plaintiffs cannot ascertain why the United States would oppose bifurcation of this case for discovery and motion practice purposes. Bifurcation will permit Randallstown to avoid expending unnecessary resources in its attempt to clear its good name and prove that it did not engage in trafficking in SNAP benefits.

Conversely, if the Plaintiffs are granted summary judgment based, in part, on the testimony of those SNAP beneficiaries who used EBT cards issued by Maryland DHR at Randallstown (and whose transactions were identified on the attachments to the Charge Letter), the number of remaining EBT transactions will likely fall below each of the thresholds for each pattern of transactions determined by FNS to be trafficking.[6] Either way, the Parties are likely to conserve substantial resources in the event that their efforts are focused on Maryland EBT

---

[5] If this Court grants summary judgment, there will be no need to conduct discovery of SNAP beneficiaries who used an EBT card issued by a state agency other than DHR.

[6] The Plaintiffs do not anticipate needing considerable discovery in order to seek summary judgment on those transactions referenced in Attachment 3. Those transactions involve the depletion of some or all of a beneficiary's SNAP benefits in an unusually short period of time. Simply put, a SNAP retailer may not refuse to permit a SNAP beneficiary to redeem any or all of his or her SNAP benefits. Failure to do so would constitute a violation of FNS's equal treatment regulation. 7 C.F.R. §274.7(f).

transactions and if this Court defers discovery and motion practice with respect to transactions by SNAP beneficiaries using EBT cards issued by state agencies other than Maryland DHR.

## This Court Has Wide Discretion to Bifurcate This Action for Discovery and Other Purposes

Fed. R. Civ. P. 42(b) provides: "For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." "Notably, '[o]nly one of these criteria need be met to justify bifurcation.'" *Bost v. Wexford Health Sources, Inc.*, 2017 WL 1862486 (D. Md., May 8, 2017)(citing *Saxion v. Titan-C-Mfg., Inc.,* 86 F.3d 553, 556 (6th Cir. 1996). This Court has broad discretion to bifurcate claims and issues and its decision will only be set aside for clear abuse. *See Dixon v. CSX Transp., Inc.,* 990 F.2d 1440, 1443 (4th Cir.), *cert denied,* 510 U.S. 915, (1993). [A]lthough Rule 42 does not expressly address the bifurcation of discovery, courts have looked to similar factors as those relevant to the bifurcation of trial when determining whether discovery related to the deferred claims should be stayed." *Cann v. Balt. Cnty., Md.,* WMN-10-2213, 2011 WL 588343, at *1 (D. Md. Feb. 9, 2011).

The Plaintiffs submit that bifurcation of this action for discovery and motion practice purposes is appropriate and will strongly serve the interests of efficiency, economy, and justice. The Plaintiffs respectfully request that this action be bifurcated into two prongs for discovery and motion practices purposes: (1) transactions related to EBT cards issued by Maryland DHR; and (2) the small number of transactions related to EBT cards issued by state agencies Maryland DHR will result in the expenditure of considerable litigant resources with relatively minor benefit to the Parties and this Court. The Plaintiffs further request that all discovery and motion practice related to non-Maryland DHR transactions be stayed.

The Plaintiffs believe that this case can likely be resolved (in favor of the Plaintiffs or Defendants) based on this Court's determination regarding whether SNAP transactions at Randallstown which involved the use of EBT cases issued by Maryland DHR constituted (or failed to constitute) patterns of trafficking in SNAP benefits above (or below) FNS's undisclosed threshold. This is true if the Plaintiffs can prove a sufficient[7] number of transactions in each pattern were legitimate ones. This likely can be done without needing any discovery relating to the relatively small number of SNAP transactions – fewer than 30 out of 908 total SNAP transactions at issue – involving EBT cards issued by state agencies other than Maryland DHR. Moreover, absent bifurcation, scarce judicial and litigant resources will be consumed in the context of addressing motion practice likely to be instituted by the eight state agencies served with subpoenas *duces tecum*[8]. Simply put, the potential benefit to the parties and this Court of proceeding with all discovery at this time is greatly outweighed by the considerable costs associated with conducting the relatively small amount of discovery of non-Maryland DHR state agencies and non-Maryland SNAP beneficiaries.

The Plaintiffs are also amenable to consideration of holding a bellwether trial involving a relatively small number of transactions related to DHR-issued EBT cards. As noted above, in the event that the number of EBT transactions that are determined by this Court to constitute (or not constitute) trafficking exceed the threshold for each pattern of trafficking, there appears to be

_____

[7] As noted above, the precise number of transactions in each pattern set forth on the attachments to the Charge Letter that Plaintiffs will need to prove are legitimate ones has not yet been disclosed by the United States. However, it is likely that the small number of transactions at Randallstown involving the use of EBT cards issued by state agencies other than Maryland DHR that FNS determined were part of four patterns of trafficking activity will fall far below FNS's threshold for each such pattern. If so, no discovery of those non-Maryland state agencies and beneficiaries may be required.

[8] These subpoenas, if needed, will be substantially similar to the one served upon Maryland DHR.

little or no benefit associated with the introduction of additional testimony or other evidence which proves (or disproves) whether additional transactions did or did not constitute trafficking. Moreover, it is important to note that the number of depositions of SNAP beneficiaries that will be required prior to the end of the discovery cut-off will be considerable and require substantial resources and time by undersigned counsel (and the likely appearance at each such deposition by counsel for the United States with attendant travel as far as Texas, Kansas, Michigan, and elsewhere).

**The United States Does Not Consent to the Relief Requested Herein**

Undersigned counsel has conferred with counsel for the United States regarding the relief sought herein. Counsel for the United States advised that the Defendant would not consent to bifurcation or any other relief sought herein.

**Conclusion**

For the foregoing reasons, the Plaintiffs respectfully request that this motion be granted, this action be bifurcated for discovery and motions practice purposes, and that all discovery and motion practice be stayed to the extent related to SNAP transactions at Randallstown using EBT cards issued by states other than Maryland DHR.

Dated this 15th day of September, 2017.

/s/ Stewart D. Fried
Stewart D. Fried, Esq. (admitted *pro hac vice*)
Mason Weeda, Esq.
Olsson, Frank, Weeda, Terman, Matz, P.C.
600 New Hampshire Avenue, N.W., Suite 500
Washington, D.C. 20037
(202) 518-6326
(202) 234-3550 Facsimile
sfried@ofwlaw.com
(Plaintiffs' lead trial attorney)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 15th day of September 2017, a copy of the foregoing

Motion to Bifurcate was served on all counsel of record via the CM/ECF system.

/s/ Stewart D. Fried
Stewart D. Fried



**United States Department of Agriculture**
Food and Nutrition Service
Supplemental Nutrition Assistance Program

January 13, 2016

Elizabeth Isabemoh, Alvan Iyke Okoroji
Randallstown African Market Int.
5316 Old Court Rd
Randallstown, MD 21133-5206

Dear Sir or Madam:

The United States Department of Agriculture Food and Nutrition Service (FNS) has compiled evidence that your firm has violated the Supplemental Nutrition Assistance Program (SNAP) regulations. Analysis of the records reveal Electronic Benefit Transfer (EBT) transactions that establish clear and repetitive patterns of unusual, irregular, and inexplicable activity for your type of firm. A listing of such transactions is enclosed.

Based on this information, we are charging your firm with trafficking, as defined in Section 271.2 of the SNAP regulations. As provided by Section 278.6(e)(1) of the SNAP regulations, the sanction for trafficking is permanent disqualification. These transactions occurred during the months of June 2015 - November 2015.

1. In a series of Supplemental Nutrition Assistance Program EBT transactions, multiple purchase transactions were made too rapidly to be credible. These transactions are listed in Attachment 1.

2. In a series of Supplemental Nutrition Assistance Program EBT transactions, multiple transactions were made from individual benefit accounts in unusually short time frames. These transactions are listed in Attachment 2.

3. In a series of Supplemental Nutrition Assistance Program EBT transactions, the majority or all of individual recipient benefits were exhausted in unusually short periods of time. These transactions are listed in Attachment 3.

4. In a series of Supplemental Nutrition Assistance Program EBT transactions, excessively large purchase transactions were made from recipient accounts. These transactions are listed in Attachment 4.

If it is determined that your firm committed the trafficking violations noted above, it will be permanently disqualified from the Supplemental Nutrition Assistance Program as provided by SNAP regulations, Section 278.6(e)(1). Civil or criminal action may also be taken against you by the United States Attorney. In addition, a fiscal claim may be assessed to recover the monetary losses to the Federal Government resulting from trafficking violations.

The SNAP regulations also provide that, under certain conditions, FNS may impose a civil money penalty (CMP) of up to $59,000.00 in lieu of permanent disqualification of a firm for trafficking. The SNAP regulations, Section 278.6(i), list the criteria that you must meet in order to be considered for a CMP. If you request a CMP, you must meet each of the four criteria listed and provide the documentation as specified within 10 calendar days of your receipt of this letter. No extension of



EXHIBIT
A

time can be granted for making a request for a CMP or for providing the required documentation. Your request and all documentation must be postmarked by midnight of the 10th calendar day after you receive this letter, in order to be considered timely. If the 10th calendar day falls on a Saturday, Sunday or legal (Federal) holiday, a request with documentation, will be timely if it is postmarked the next day which is not a Saturday, Sunday or legal (Federal) holiday. If your request and the required documentation are not submitted on time, you will lose your right for any further consideration for a CMP. If it is determined that you qualify for a CMP, the amount of that penalty will be $59,000.00. Payment in full is due within 30 calendar days after you receive our determination letter. The amount of the CMP was calculated in accordance with SNAP regulations at Section 278.6(j).

If you do not request consideration for a CMP or are determined to be ineligible for a CMP, the permanent disqualification of your firm shall be effective on the date of receipt of the letter informing you of our final decision (SNAP regulations, Section 278.6(c)). If the permanent disqualification of your firm is later reversed through administrative or judicial review, USDA shall not be liable for the value of any sales lost during the period of disqualification you served.

If you are an authorized vendor under the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC), you may be disqualified from the WIC Program as a result of your disqualification from SNAP. In accordance with current law governing both the SNAP and the WIC Program, such a WIC Program disqualification is not subject to administrative or judicial review under the WIC Program. A CMP from the Supplemental Nutrition Assistance Program may also result in a WIC Program disqualification, but such a disqualification would be subject to administrative and/or judicial review.

In the event that you sell or transfer ownership of your store subsequent to your disqualification, you will be subject to and liable for a CMP as provided by SNAP regulations, Sections 278.6(f) (2),(3) and (4). The amount of this sale or transfer CMP will be calculated based on SNAP regulations, Section 278.6(g).

We may disclose information to the public when a retailer has been disqualified or otherwise sanctioned for violations after the time for any appeals has expired. This information is limited to the name and address of the store, the owner(s)/officer(s) names and information about the sanction itself.

SNAP regulations Section 278.6(b) explain your right to reply to the charges, and Sections 278.6(c) through (m) describes the procedures we will follow in making a decision in this case. If you wish to present any information, explanation, or evidence you have regarding these charges, you must reply within 10 calendar days of the date you receive this letter.

You may reply either by phone or in writing. You may have legal counsel assist you in presenting your reply. To respond by phone, please make an appointment for this purpose by telephoning Arif Ahmed at (212) 620-3692. If you schedule but fail to keep an appointment, we will consider that action as a non-response to this letter.

Submit any written response to:

Attn: Arif Ahmed
USDA, Food and Nutrition Service
201 Varick St

Rm 609
New York, NY 10014-7066
Phone: (212) 620-3692     Fax: (844) 490-0038

We will fully consider your reply and any documentation you provide before we make a final decision in this matter. However, if we do not hear from you within 10 calendar days of receipt of this letter, we will make a decision based on the information available to us, and advise you of that decision in writing.

Any documentation submitted becomes the property of FNS and will not be returned.

Current SNAP regulations are available online, at
http://www.fns.usda.gov/snap/retailers-store-training-information.

Sincerely,

Gilda Torres
Section Chief, Retailer Operations Division
USDA, Food and Nutrition Service
Supplemental Nutrition Assistance Program

Enclosure

Page 1

1                UNITED STATES DISTRICT COURT

2                MIDDLE DISTRICT OF FLORIDA

3                      TAMPA DIVISION

4    ------------------------------x

5    JL CORPORATION OF ARCADIA, INC.,:

6    A Florida Corporation d/b/a      :

7    ARCADIA CITGO, MOHAMMED A.       :

8    UDDIN & AKM MOHUDDIN CHOWDHURY, : Civil Action No.:

9         Plaintiffs,              : 8:15-CV-2433-T-23-UAM

10             v.                   :

11   UNITED STATES OF AMERICA,      :

12   Defendant.                  X

13                             Washington, DC

14                    Friday, October 28, 2016

15   Deposition of:

16                    DOUGLAS WILSON

17   Called for examination by counsel for the Plaintiff,

18   pursuant to notice, at 501 3rd Street, NW, Washington,

19   DC, before Erick McNair of Veritext Legal Solutions,

20   a Notary Public in and for the District of Columbia,

21   beginning at 10:49 a.m., when were present on behalf

22   of the respective parties:



Page 21

1    of the system came online.

2         Q    Does anybody have a copy of the database

3    prior to 2010?

4         A    We have archive data and the raw data

5    format.

6         Q    I suppose we should probably go to one of

7    the logical questions we sort of skipped.  What is the

8    alert system?

9         A    The alert system is a tool to decision

10   support system to help detect fraudulent behavior.

11        Q    And you had indicated that was originally

12   started, the first version would have been mid-90s?

13        A    Late 90s.

14        Q    Late 90s?

15        A    Yes.

16        Q    And you'd been with the program almost the

17   whole way through.  Its application by the Department

18   has that grown since the beginning?

19        A    Yes.

20        Q    How so?

21        A    It has expanded.  The reports available to

22   the user has improved.

Page 22

1    Q    How so?

2    A    Newer reports have been developed.

3    Q    What are --

4    A    All the reports have been refined.

5    Q    I apologize, I didn't mean to interrupt you.

6    A    No.

7    Q    When you say newer reports have been

8    developed, what do you mean by developed?

9    A    We receive a request from a user that they

10   would like certain information to be displayed to be

11   able to provide us reports for analysis purposes.  So

12   we've developed reports to help them with their

13   analysis based on their information.

14   Q    You also indicated that the reports have

15   been refined.  Is -- can you tell me about the

16   refining process that's gone on since your

17   participation started with the alert system?

18   A    As we generate reports sometimes the reports

19   don't provide the necessary information.  So we get

20   feedback from the user community and we tailor those

21   reports to better fit their need.

22   Q    So is this a change in how the system is

Page 23

1    processing the data or how the system is displaying

2    the data for the end user?

3         A    It is the process of displaying the data.

4         Q    And so you had indicated that the system is

5    designed to be a decision support system, I think was

6    specifically your term.  What is it that the end user

7    is typically trying to make a decision about when he

8    or she reviews the data that your system put together

9    and subsequently turns over to the end user?

10        A    The data that is produced by the system will

11   look for different behaviors, patterns in the data.

12   And it points out unusual patterns by a retailer.

13   Which allows, then allows the user to look at the

14   information and make a determination.

15             MR. STEGEBY:  And may I make it clear for

16   the record too that Mr. Wilson that his expertise is

17   in the alert system and the database handling.  What

18   happens to the reports, who addresses the reports and

19   analyzes them is not part of his task.  So as a 30B6

20   witness he's not going to be able to testify in much

21   detail here.

22             MR. TAPP:  All right.  And as part of the

Page 24

1    record Mr. Stegeby has talked about that with me

2    beforehand.   And this deposition is intended for

3    general operation purposes of the alert system.   Not

4    specific to any of the different cases that we have.

5    As we've mentioned earlier we have several cases.   I

6    have eight or nine cases across the country on this.

7    So this is one of those things where we are trying to

8    consolidate as much of our time and effort as we can

9    into a single transcription, into a single deposition

10   if at all possible.

11           Also, while we're on it, Mr. Stegeby and I

12   had spoken about the different thresholds that the

13   system uses.   And specifically that I would not be

14   diving deeply into the thresholds in this particular

15   deposition.   I do reserve my right to ask them at a

16   subsequent deposition, whether that be in person or in

17   writing.   That would be to be determined.   But as Mr.

18   Stegeby and I spoke about that would be subject to an

19   order which would protect the information derived

20   therefrom.   An order which at this moment in the

21   Middle District of Florida cases upon which this is

22   noticed there isn't an order yet.   So we're going to

Page 25

1    do the best that we can to stay away from those

2    specifics of exactly what those numbers are.  I'm

3    going to do the best I can to broadly and generally

4    ask you those questions.  But if we get to a point

5    where you feel as though we are -- I am asking

6    questions where I'm crossing into the specifics line,

7    I would appreciate it if you'd ask me for just a break

8    so that we could discuss the specifics so that I could

9    make sure we treated on ground that we're supposed to

10   be treading on right now based upon Mr. Stegeby's

11   conversations with me.  So did I get that right?

12         BY MR. STEGEBY:  Yeah, that's correct.

13   BY MR. TAPP:

14   Q    All right.  So this system is looking for

15   fraud, right?

16   A    This system is looking for unusual patterns,

17   behavior.

18   Q    And from your side, and obviously this is

19   caveat about what Mr. Stegeby stated earlier, from

20   your side the unusual patterns and behavior are

21   indicative of what?

22   A    Patters are indicative of possible wrong

Page 26

1    doing.

2         Q    Possible what?

3         A    Wrong doing.

4         Q    Well, I didn't take a whole lot of

5    statistics classes in college, I took a handful.  But

6    if I understand it if it's going to be looking for

7    patterns you would have to have an original pile of

8    data upon which to recognize those patterns or to

9    derive those patterns from when comparing them to new

10   data coming in when you're looking for functionally

11   the same symptoms.  Is that correct?

12        A    Correct.

13        Q    All right.  Where did these patterns come

14   from, where were they deciphered from originally?

15        A    They were, from my knowledge, they were

16   based upon previous investigator's knowledge prior to

17   the alert system.

18        Q    You've been with the program for so long.

19   Have the patterns changed over the period of time to

20   your knowledge that you've been with the program?

21        A    No.

22        Q    So the system, the alert system as we look

Page 27

1    at it in 2016 is looking for the same information that

2    it was looking for at its inception in the late 90s.

3         A    Yes.

4         Q    All right.  And we spoke a minute ago.  And

5    again, I don't want to get into specifics.  There are

6    thresholds as I understand it that the patterns have

7    to rise above a certain threshold in order for it to

8    trigger certain reports.  Is that fair?

9         A    Correct.

10        Q    Okay.  The thresholds have they changed over

11   time?

12        A    To my knowledge, no.

13        Q    So the whole system, the patterns that

14   you're looking for in the system, and not you

15   specifically, but that the computer is looking for in

16   the system and the thresholds have been identical

17   since the 90s?

18             MR. STEGEBY:  Objection to form, but you can

19   answer it.

20             W:  I cannot answer that.

21   BY MR. TAPP:

22        Q    For the benefit of the record --

Page 28

1       A     Well --

2       Q     Go ahead.

3       A     I can't honestly say if they have or have

4    not.

5       Q     That's outside your scope of knowledge?

6       A     Yes.

7       Q     Okay.  You are aware of the patterns and the

8    thresholds presently, correct?

9       A     Correct.

10      Q     For about how long have you been aware of

11   patterns and the thresholds?

12      A     I have been involved with the patterns and

13   thresholds approximately the past ten years.

14      Q     Since 2006 or so?

15      A     Yes.

16      Q     And in that timeframe to your personal

17   knowledge the patterns and the thresholds have not

18   changed?

19      A     Correct.

20      Q     Now, from a statistical standpoint obviously

21   it's very relevant to us to know exactly how the

22   patterns were established originally.  So I'm going to

Douglas Wilson                                                October 28, 2016

Page 29

1    circle back to that question.  You had indicated that

2    to your knowledge it was the result of some

3    investigators that had done some work prior to the

4    existence of the alert system.

5        A    Correct.

6        Q    All right.  Can you tell me where I can find

7    the information pertaining to where those original

8    patterns came from?

9        A    I do not know.

10       Q    Does anybody?

11       A    I do not know.

12       Q    Forgive me, but how do you know the system

13   is accurate if you don't know where the patterns that

14   you're using came from?

15            BY MR. STEGEBY:  Objection to the form.  You

16   can answer if you want, if you can.

17            W:  From statistics, reports past years.

18   For example, FY-15.

19   BY MR. TAPP:

20       Q    Uh-huh.

21       A    I believe there was an approximately 92

22   percent successful sanction rate.

Page 30

1      Q      That's interesting that you bring that up.

2   It has a 92 percent success rate in 2015?

3      A      FY-15.

4      Q      Okay.  Is there a margin of error inside of

5   the statistical data that you're aware of?

6      A      I'm not aware.  I don't know.

7      Q      Okay.  So it's not that there isn't one,

8   it's just that you're not specifically familiar with

9   what that margin may or may not be.

10      A      Correct.

11      Q      Okay.  And so how is this not sort of a

12   self-fulfilling prophecy if you indicate that you have

13   a successful rate of 92 percent, whatever that may be,

14   set against the pattern that is being used presently

15   to charge those individuals?  Isn't that functionally

16   the pot calling kettle black?  I mean it's the same

17   information circle, would you agree?

18           MR. STEGEBY:  Objection to form.  But you

19   can answer if you can.

20   BY MR. TAPP:

21      Q      If you can find the question in that one.

22   Let me rephrase.  So you don't know where the pattern

1     came from, but you assume that the pattern is correct

2     because the people that you charge with it in 2015 you

3     subsequently disqualified it at a 92 percent success

4     rate.

5               MR. STEGEBY:  Objection to form.  But you

6     can answer if you want to.  I can explain.

7               MR. TAPP:  That's okay.  Answer.

8               W:  I don't know.

9     BY MR. TAPP:

10        Q     Okay.  Do you recognize that there could be

11    an inherent problem with the system if, and this is

12    outside your purview, but we're going to do a

13    hypothetical, if the end user, the investigators are

14    giving more credence to the data if the data that's

15    been selected out of the system is a result of

16    patterns?  I just complicated the hell out of that one

17    too.  There's no easy way to do this.

18              MR. STEGEBY:  (Inaudible)

19    BY MR. TAPP:

20        Q     All right, I'm going to think this one

21    through.  We're going to get through this one this

22    time.  The veracity and the accuracy of the program is

1   based upon the veracity and the accuracy of those

2   patterns, right?

3       A    I don't understand.

4       Q    The program can't possibly be accurate if

5   the patterns upon which it is based are not correct;

6   isn't that true?

7       A    I assume.

8       Q    Okay.  And so as a predicate for all of the

9   reports and the data that the alert system puts out in

10  its various forms to the end users, all of that is

11  operating under the assumption that the original

12  patterns were correct and have not changed in at least

13  a decade, right?

14      A    The patterns look for statistical behavior.

15      Q    Uh-huh.  And where is that statistical

16  behavior derived from?

17      A    From my knowledge previous investigator's

18  knowledge.

19      Q    So when you say previous investigator's

20  knowledge, and I understand that we're working with

21  limited knowledge on your part --

22      A    Uh-huh.

1    Q    -- the way that you say that, the why that I

2    interpret that for purposes of the record at the

3    moment is that a series of SNAP investigators got

4    together in the mid-90s, early 90s and said what do we

5    see in common with all these stores that are

6    trafficking and doing these other things?  And they

7    put together what they believe to be patterns.  Is

8    that what you're relaying to me when you're saying the

9    prior investigators put that together?

10   A    Yes.

11   Q    Okay.  There had to have been case studies

12   to create these patterns, wouldn't you agree?

13        MR. STEGEBY:  Objection to form, but you can

14   answer it.

15        W:   I can't say if there were or were not.

16   I don't know.

17   BY MR. TAPP:

18   Q    And so the system has continued to operate

19   the way that the system operates under the assumption

20   that everything that came before it was good, was

21   accurate, right?

22   A    Yes.

Douglas Wilson                                      October 28, 2016

Page 34

1      Q    All Right.  But we have no way to test the

2    veracity of the original patterns other than the, and

3    I apologize, other than the results that you're

4    getting on disqualification rates.

5           MR. STEGEBY:  Hold on.  Can you ask that

6    question again?

7           MR. TAPP:  Maybe.  If you could read that

8    back to me, because I don't think I can.  We'll come

9    off the record.  Okay, let's stay on the record for a

10   minute.

11   BY MR. TAPP:

12     Q    All right.  So my prior question which was

13   worded in a very roundabout way was intended to be

14   that the veracity to the accuracy of the system, as

15   far as the Department is concerned, is verified by the

16   results that the Department achieves and its

17   administrative disqualifications of stores as a result

18   of charging matters.

19     A    Yes.

20     Q    All right.  Okay.  All right.  So we've from

21   a very 10,000-foot point of view asked about what the

22   system does.  I'm going to go into a little bit more

```
 1   detail.  So and we're going to do it using

 2   hypotheticals, because I think that's going to be the

 3   easiest way for it to come across.  But we'll say John

 4   Smith --

 5             MR. STEGEBY:  Do you want to take a break?

 6             MS. PIERCE:  Yeah.

 7             MS. STEGEBY:  Take five.

 8             (Off the record.)

 9             (Back on the record.)

10   BY MR. TAPP:

11       Q    So the questions that I'm going to ask you

12   are based upon your personal knowledge.  They are

13   going to be phrased hypothetically in order to help

14   whoever reads this transcript understand what it is

15   that we're talking about.  But it's entirely intended

16   to only display what it is that you know personally.

17   If there is something that you do not know personally,

18   something that you would have to speculate on, please

19   indicate so that the record is clear.  Do you

20   understand?

21       A    Yeah.  Yes.

22       Q    Okay.
```

1          MR. STEGEBY:  And to, just so you know as

2     well, to the extent which you're asked to speculate on

3     something you don't have personal knowledge of or

4     experience with, then don't go there.

5          W:  Okay.

6          MR. STEGEBY:  You can't testify about that.

7     You're a fact witness.  You're not an expert witness

8     who can provide opinions.  So it's purely based on

9     your experience.  And I appreciate that clarification.

10    BY MR. TAPP:

11        Q    All right.  So now that we're there we've

12    got John Smith.  John Smith is at a gas station in

13    we'll call it Georgia.  And he is a SNAP participant.

14    And he goes and he purchases his food items, we'll

15    call it $20 worth of food items.  That transaction

16    gets recorded and actually processed by the processor.

17    And the processor subsequently transfers that

18    transaction's data to FNS, correct?

19        A    Correct.

20        Q    All right.  From FNS it resides in a

21    database.

22        A    Correct.

1      Q      And that databased has been building and

2   ongoing since 2006 or 2010.

3      A      Correct.

4      Q      Okay.  So this month marks six years' worth

5   of information that you have.

6      A      Correct.

7      Q      Okay.  And that information, that

8   transaction data sits there permanently.

9      A      Correct.

10      Q      Or until the next version comes out and that

11   particular database is retired.

12      A      Correct.

13      Q      Okay.  Then the alert system compiles all of

14   that data and applies to it a filter looking for

15   certain patterns; is that correct?

16      A      Correct.

17      Q      Okay.  Are you personally familiar with the

18   different, I think there's about five, categories of

19   patterns that the system ends up reporting after it's

20   left your hands, but ends up reporting later?

21      A      Yes.

22      Q      Okay.  And if you wouldn't mind for the